*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
September 14, 2023

Plaintiff-Appellee,

v

No. 361835
Allegan Circuit Court
LC No. 2021-024265-FC

RODNEY ANTHONY JACKSON, JR.,

Defendant-Appellant.

Before: SWARTZLE, P.J., and O'BRIEN and FEENEY, JJ.

PER CURIAM.

Defendant, Rodney Anthony Jackson, Jr., appeals by right his jury convictions of three counts of criminal sexual conduct in the first degree (sexual penetration involving a person under 13 years of age), MCL 750.520b(1)(a), and two counts of criminal sexual conduct in the second degree (sexual contact involving a person under 13 years of age), MCL 750.520c(1)(a). The trial court sentenced Jackson to serve 300 to 720 months in prison for each of his convictions of first-degree criminal sexual conduct and to concurrently serve 10 to 15 years in prison for each of his convictions of second-degree criminal sexual conduct.

On appeal, Jackson argues that he was deprived of a fair trial in several ways. He maintains that the trial court allowed improper testimony about a polygraph test, should not have allowed testimony that Jackson sexually assaulted another child, and violated his due-process rights by allowing the admission of deoxyribonucleic acid (DNA) evidence without a sufficient context to allow the jury to evaluate it. In a brief submitted under Standard 4,[1] Jackson argues that the prosecution and defense counsel committed numerous errors that warrant a new trial. He also asserts that the trial court committed several evidentiary errors during the preliminary examination and at trial, and he complains that his convictions were unsupported by constitutionally sufficient evidence and contrary to the great weight of the evidence. He states that this Court should remand this case for a new preliminary examination or a new trial on the basis of these errors.

---

[1] See Supreme Court Administrative Order No. 2004-6, 471 Mich c, cii (2004).

We conclude that Jackson has not identified any errors that warrant relief. Accordingly, we affirm.

## I. BASIC FACTS

Testimony established that, during the events at issue, Jackson lived with his girlfriend, Keidria Anderson, her two children from previous relationships, JB and AB, as well as his two children with Anderson. They all lived in a small trailer home in Allegan County, Michigan.

In August 2020, JB disclosed to her biological father, Michael Ellis, and her grandmother, Diane Morrison, that Jackson had been sexually abusing her. AB, who was then under 13 years of age, revealed similar abuse after her sister's disclosure. The prosecutor charged Jackson with having committed the above-summarized offenses on the basis of AB's disclosures.

AB testified at trial and informed the jury that Jackson had repeatedly and regularly subjected her to sexual acts from about the time she was six years of age. She described incidents of cunnilingus, sexual rubbing and touching, sexual penetration, and masturbation. The jury found AB credible and convicted Jackson of all five counts of criminal sexual conduct.

## II. IMPROPER POLYGRAPH TESTIMONY

### A. PRESERVATION AND STANDARD OF REVIEW

Jackson first argues that the trial court erred when it allowed Morrison to testify about a polygraph. He argues in the alternative that defense counsel's failure to object to the testimony amounted to ineffective assistance. As Jackson concedes on appeal, he did not preserve his evidentiary claim of error by objecting before the trial court. See *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019).

This Court reviews a trial court's decision on an evidentiary matter for an abuse of discretion. *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Clark*, 330 Mich App at 415. A trial court necessarily abuses its discretion when it premises its decision on an error of law. *McFarlane*, 325 Mich App at 517. This Court reviews de novo whether the trial court properly interpreted and applied the law. *Clark*, 330 Mich App at 415. Because Jackson did not preserve the evidentiary claim of error, this Court's review is for plain error that affected Jackson's substantial rights. See *id*. at 414. To establish a plain error that warrants relief, Jackson must show that there was a plain or obvious error and that the error affected the outcome of the trial. See *McFarlane*, 325 Mich App at 517-518.

Whether defense counsel provided ineffective assistance at trial involves a mixed question of fact and law. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20. This Court's review of the claim of ineffective assistance is limited to claims of ineffective assistance that are apparent on the record alone. See *Clark*, 330 Mich App at 426.

## B. ANALYSIS

It is a bright-line rule that a witness may not discuss polygraph tests at trial. *People v Nash*, 244 Mich App 93, 97; 625 NW2d 87 (2000). During defense counsel's cross-examination, Morrison referred to a "lie detector," which amounted to plain error. See *id*. The trial court interrupted Morrison and prevented her from completing her answer. The entire cross-examination covered just a few minutes:

> *Q*. Ms. Morrison, you don't like my client, Mr. Jackson, do you?
>
> *A*. No, sir.
>
> *Q*. Why is that?
>
> *A*. Because he's a rapist. He messed with babies.
>
> *Q*. You didn't like him before you were informed of these allegations, did you?
>
> *A*. No, sir.
>
> *Q*. Why not at that time?
>
> *A*. Because there was an allegation the same to this one before.
>
> *Q*. And there was no investigation of that?
>
> *A*. No, sir.
>
> *Q*. He was the one that reported that—
>
> *A*. No.
>
> *Q*. —at that time?
>
> *A*. No, sir. No, I did.
>
> *Q*. You did?
>
> *A*. Yes, I called the lie detector test—
>
> *The Court*: Can I please have the parties come forward?

Although Morrison improperly referred to a lie detector test, her reference does not automatically warrant a new trial. This Court has identified factors that are relevant to assessing whether the introduction of evidence about a polygraph warrants a new trial:

(1) whether defendant objected and/or sought a cautionary instruction; (2) whether the reference was inadvertent; (3) whether there were repeated references; (4) whether the reference was an attempt to bolster a witness's credibility; and (5) whether the results of the test were admitted rather than merely the fact that a test had been conducted. [*Nash*, 244 Mich App at 98 (quotation marks and citation omitted).]

Morrison's remark was arguably unresponsive and appeared to be inadvertent. Morrison attempted to explain that she reported the past misconduct—not Jackson—and she blurted out that "she called the lie detector test" as part of that effort. Morrison's reference was, however, enigmatic. It was not clear whether she was saying that she called for one to be administered or was calling the persons responsible for administering one. In any event, the context did not allow an inference that anyone actually took a polygraph test. The statement did not implicate any particular person or any particular result, and it did not bolster or undermine any witness's testimony. Accordingly, any prejudice occasioned by the remark was *de minimis* and could readily have been cured with an instruction. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Therefore, Jackson has not established a plain, outcome-determinative error. See *McFarlane*, 325 Mich App at 517-518.

Jackson also claims that defense counsel provided ineffective assistance in his handling of this error. Specifically, he faults defense counsel for failing to object and failing to move to have the answer stricken. To establish a claim of ineffective assistance of counsel that warrants relief, Jackson must show that defense counsel's handling of this incident fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for the unprofessional conduct, the result of the lower court proceeding would have been different. See *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), citing *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). In evaluating whether defense counsel's performance fell within the range of competent representation, this Court presumes that defense counsel rendered effective assistance and this Court must affirmatively entertain the range of possible reasons counsel may have had for proceeding as he did. *Vaughn*, 491 Mich at 670, citing, in relevant part, *Cullen v Pinholster*, 563 US 170, 196; 131 S Ct 1388; 179 L Ed 2d 557 (2011).

Defense counsel did not object to Morrison's answer—presumably because there was no need given that the trial court itself immediately intervened. The trial court later stated that it held a bench conference to ensure that the questioning did not get into an inappropriate topic. Defense counsel did not move to strike the testimony, but, as noted, Morrison's remark was isolated, inadvertent, and devoid of context that permitted prejudicial inferences. Whatever prejudice the remark caused was so minor that bringing further attention to it through a request to strike might have caused more prejudice than the isolated remark itself caused. Under those circumstances, a reasonable defense lawyer might choose to let the matter pass without further comment. See *People v Randolph*, 502 Mich 1, 12; 917 NW2d 249 (2018). Accordingly, Jackson has not established that defense counsel's response fell below an objective standard of reasonableness under prevailing professional norms, and any prejudice was so minor that there is no reasonable probability that it affected the outcome. See *Vaughn*, 491 Mich at 669.

-4-

### III. OTHER-ACTS TESTIMONY

#### A. PRESERVATION

Jackson next argues that the trial court erred when it allowed JB to testify at AB's trial and describe how Jackson sexually abused her. He maintains that the trial court should have excluded the testimony under MRE 403 and argues that allowing such testimony violated due process.

To preserve an evidentiary claim of error for appellate review, "defendant had to object before the trial court and specify the same ground for objection that he asserts on appeal." *Clark*, 330 Mich App at 414. The prosecution notified Jackson that it intended to present JB's testimony under MCL 768.27a. Defense counsel argued at a hearing that the use of the other-acts evidence generally should be limited to acts that occurred in Allegan. He stated that it would be "overkill" to allow testimony on additional incidents, including incidents that occurred in other counties, and that it was unnecessary to allow the jury "to understand what transpired here." He stated that the court should exclude the evidence as more prejudicial than probative. The trial court disagreed and granted the prosecution's request to present evidence that would give an "overview" of Jackson's relationship "in its entirety."

Although he limited his argument to the acts that occurred in Ottawa County, Jackson's trial counsel arguably preserved a claim that the other-acts testimony should have been excluded under MRE 403. He did not, however, do anything to preserve a claim that MCL 768.27a was unconstitutional or that it was a violation of due process to allow the prosecution to present other-acts evidence. As such, Jackson has not preserved his claims that the introduction of the other-acts testimony was unconstitutional. See *Clark*, 330 Mich App at 414.

#### B. STANDARD OF REVIEW

This Court reviews a trial court's decision on an evidentiary matter for an abuse of discretion. *McFarlane*, 325 Mich App at 517. This Court reviews de novo whether the trial court properly interpreted and applied the law. *Clark*, 330 Mich App at 415. Because Jackson did not preserve his constitutional claim of error, this Court's review of that claim is for plain error that affected Jackson's substantial rights. See *id*. at 414.

#### C. ANALYSIS

The Legislature authorized the prosecution to present evidence that a defendant, who had been charged with criminal sexual conduct against a minor, committed similar offenses against other minors. Specifically, the Legislature stated that, notwithstanding the general limitations on the use of other-acts evidence stated under MCL 768.27, "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." MCL 768.27a(1). The Legislature defined a "minor" to be a person who was less than 18 years of age and defined a listed offense to include, in relevant part, criminal sexual conduct. See MCL 768.27a(2).

As our Supreme Court has observed, MCL 768.27a(1) conflicts with MRE 404(b) because it allows the admission of other-acts evidence even to demonstrate a defendant's propensity to

engage in sex acts with a minor. *People v Watkins*, 491 Mich 450, 470-472; 818 NW2d 296 (2012). The Court determined that, because the statute reflects a substantive policy choice concerning the protection of children, the rule stated under MCL 768.27a prevails over MRE 404(b). *Id*. at 472-477. Accordingly, if the prosecution establishes that evidence is admissible under MCL 768.27a, it does not also have to establish that the evidence is admissible under MRE 404(b). *People v Buie (On Remand)*, 298 Mich App 50, 74; 825 NW2d 361 (2012).

Jackson does not contest that the testimonies at issue involved acts that met the requirements for admission under MCL 768.27a(1). Jackson only argues that the trial court erred when it refused to bar the testimonies under MRE 403.

Our Supreme Court has held that trial courts must still apply MRE 403 when considering whether to admit evidence that would otherwise be admissible under MCL 768.27a(1). *Watkins*, 491 Mich at 455. MRE 403 allows a trial court to exclude otherwise admissible evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. A trial court may not exclude evidence under MRE 403 simply because it is prejudicial because all relevant evidence is prejudicial; it only provides for the exclusion of evidence that is unfairly prejudicial. *People v McGhee*, 268 Mich App 600, 607; 709 NW2d 595 (2005). "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998).

The Supreme Court rejected the contention that the propensity value of evidence admitted under MCL 768.27a(1) should be weighed against the admission of the evidence in the consideration of MRE 403. The Court explained that doing so would undermine the Legislature's policy choice that such evidence may be used for any relevant purpose. *Watkins*, 491 Mich at 486. For that reason, the Court held that "courts must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Id*. at 487. The Court nevertheless concluded that evidence otherwise admissible under MCR 768.27a(1) might be excludable under MRE 403:

> This does not mean, however, that other-acts evidence admissible under MCL 768.27a may never be excluded under MRE 403 as overly prejudicial. There are several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Id*. at 487-488.]

JB's testimony was highly relevant to a variety of issues. She testified that Jackson engaged in sex acts with her that were substantially similar to those that AB testified Jackson committed against her. JB's testimony established that Jackson engaged in the acts beginning at

a similar age, with a similar frequency, and under similar circumstances. Accordingly, the factors identified by our Supreme Court in *Watkins* all weigh in favor of the admission of JB's testimony. See *id*. Indeed, JB's testimony was likely admissible consistent with MRE 404(b) for purposes beyond establishing Jackson's propensities: her testimony established Jackson's intent and his scheme, plan, or system in doing the acts, see MRE 404(b)(1); and tended to bolster AB's credibility in response to Jackson's argument that AB was fabricating her claims, see *People v Starr*, 457 Mich 490, 501; 577 NW2d 673 (1998). JB's testimony—when considered together with AB's testimony—was powerful evidence that Jackson had a propensity to use his girlfriend's minor daughters to gratify his sexual desires. That fact also weighed in favor of its admission. See *Watkins*, 491 Mich at 487. JB's testimony was not marginal, and, because her testimony was highly probative of several relevant issues at trial, there was no danger that the jury would give her testimony undue or preemptive weight. See *Crawford*, 458 Mich at 398.[2]

On appeal, Jackson further faults the trial court for failing to make a more thorough discussion of its decision to allow the other-acts testimony. He complains that the trial court failed "to engage in a proper balancing test under MRE 403 and to consider the *Watkins* factors."

The trial court did not have to go into elaborate detail when explaining its decision; it only had to make brief, definite, and pertinent findings and conclusions on the contested matters. See MCR 2.517(A)(2). At the hearing about which Jackson now complains, defense counsel offered a perfunctory challenge to the admissibility of the contested evidence. Specifically, he asked the trial court to exclude the other-acts testimony to the extent that it involved acts that occurred before the family moved back to Allegan County. He maintained that these older acts amounted to "overkill" and was unnecessary to present the full picture. Notably, defense counsel also did not address the factors stated under *Watkins*. The trial court disagreed with defense counsel's actual argument and determined that the evidence was relevant and admissible to establish an "overview" of Jackson's relationship with the children "in its entirety." The trial court had no obligation to provide an analysis on matters beyond that which defense counsel contested. See MCR 2.517(A)(2). Accordingly, the trial court did not err when it determined that the evidence tending to show that Jackson also abused JB was admissible under MCL 768.27a and did not err when it refused to exclude that evidence under MRE 403.

Jackson also argues that MCL 768.27a violates due process because it undermines the fundamental fairness of criminal trials by allowing the prosecution to present evidence to prove an improper character-to-conduct inference—that is, because it allows propensity evidence—in contravention of longstanding rules to the contrary. The Supreme Court of the United States has held that the states have "broad latitude under the Constitution to establish" rules governing the introduction of evidence. *United States v Scheffer*, 523 US 303, 308; S Ct 1261; 140 L Ed 2d 413 (1998). A defendant's right to present their defense must normally bow to the state's legitimate interests in the management of the criminal trial process. *Id*. Nevertheless, a state's rule may violate due process if it is arbitrary or disproportionate to the purpose for which the rule was designed. *Id*.

---

[2] . For similar reasons, it cannot be said that Dr. Yvonne Rekeny's testimony about JB's comments was inadmissible under MRE 403.

Jackson does not argue that MCL 768.27a is arbitrary or that its effect is disproportionate for the purpose that it was designed to address. Indeed, he does not even discuss the substantive purposes behind the statute: the protection of children and the prosecution of persons who commit sexual offenses against child victims. See *Watkins*, 491 Mich at 476. He also does not address the other procedural safeguards involving the admission of evidence that protect his right to a fair trial. Instead, he merely expresses disagreement with the Legislature's policy choice and asserts that he would rather see the old rule maintained because, in his view, that rule was fairer. By failing to offer a meaningful analysis of the law applicable when challenging the state's adoption of a rule of evidence on the ground that the rule violates due process, Jackson abandoned this claim of error. See *Clark*, 330 Mich App at 426.

Notably, this Court has found that MCL 768.27a does not violate due process. *People v Muniz*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 355977); slip op at 12. Additionally, federal courts have held that an analogous rule under federal law, FRE 414, did not violate due process. Those courts have explained that there is no constitutional right to the exclusion of propensity evidence and, so long as the courts remain able to exclude otherwise admissible propensity evidence under FRE 403, the rule allowing the admission of propensity evidence does not violate due process. See *United States v Schaffer*, 851 F3d 166, 180-181 (CA 2, 2017); *United States v LeMay*, 260 F3d 1018, 1027 (CA 9, 2001); *United States v Castillo*, 140 F3d 874, 879-883 (CA 10, 1998).[3]

Because evidence admitted under MCL 768.27a remains subject to the rules of relevance and admissibility, see MRE 401 and MRE 402 and can be excluded under MRE 403, the statute does not on its face violate due process. See *Schaffer*, 851 F3d at 180-181; *LeMay*, 260 F3d at 1027; *Castillo*, 140 F3d at 879-883. Moreover, as already discussed, the trial court did not err when it determined that the evidence was relevant and not excludable under MRE 403. Consequently, Jackson has not established plain error because he has not shown that MCL 768.27a was unconstitutional on its face or that the trial court unconstitutionally applied it at his trial. See *McFarlane*, 325 Mich App at 517-518. Accordingly, Jackson has not shown that MCL 768.27a violates due process and has not shown that the trial court abused its discretion when it admitted the evidence that Jackson committed other criminal sexual acts against JB. See *Clark*, 330 Mich App at 415.

## IV. DNA EVIDENCE

## A. STANDARD OF REVIEW

Jackson next argues that it was error to allow the prosecution to present evidence that DNA from Jackson's sperm cells was found on sheets used in the children's rooms because there was insufficient match evidence as required by the decision in *People v Coy*, 243 Mich App 283; 620 NW2d 888 (2000) (*Coy I*). He also argues that defense counsel's failure to object to the DNA evidence amounted to ineffective assistance of counsel.

---

[3] Federal decisions are not binding on this Court, but may be persuasive. See *People v Rogers*, 338 Mich App 312, 327; 979 NW2d 747 (2021).

This Court reviews a trial court's decision on an evidentiary matter for an abuse of discretion. *McFarlane*, 325 Mich App at 517. This Court reviews de novo whether the trial court properly interpreted and applied the law. *Clark*, 330 Mich App at 415. Because Jackson did not preserve the evidentiary claim of error, this Court's review is for plain error that affected Jackson's substantial rights. See *id*. at 414.

Whether defense counsel provided ineffective assistance at trial involves a mixed question of fact and law. *Gioglio*, 296 Mich App at 19. This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20. This claim is limited to errors that are apparent on the record. See *Sabin*, 242 Mich App at 658.

B. ANALYSIS

Jackson first maintains that the trial court should have excluded the testimony by an expert on DNA analysis, Erica St. Clair, concerning the DNA discovered on the bed sheets seized from the home where Jackson and AB resided during the events at issue. He states that the trial court had to exclude the evidence because the prosecution failed to provide an adequate foundation for the testimony under *Coy*.

In *Coy I*, 243 Mich App at 293-294, this Court addressed a situation where the lab that performed a DNA analysis had a policy to not calculate statistical estimates for mixed DNA samples. This Court noted that the expert testified that "the likelihood that the sperm DNA (found in the victim's body) belonged to an African-American individual other than defendant was one in 543 million." *Id*. at 286 n 2. As for the mixed sample, this Court determined that, absent a statistical analysis, the expert testimony that the defendant could not be excluded as a donor to the mixed sample was unhelpful and inadmissible under MRE 702 and excludable under MRE 403. *Id*. at 294-303.

On retrial, the prosecution presented statistical analysis concerning the mixed sample. *People v Coy*, 258 Mich App 1, 4-9; 669 NW2d 831 (2003) (*Coy II*). This Court considered the admissibility of that testimony and determined that the statistical analysis was sufficient. *Id*. at 9-10. This Court noted that, once there was sufficient statistical analysis for the jury to properly evaluate the DNA evidence, the testimony was admissible notwithstanding that one might properly challenge the statistical predications because the degree of confidence in the predictions was a matter of weight and credibility, not admission. *Id*. at 10-11.

In this case, St. Clair testified that that sperm cells have a stronger shell than ordinary cells. For that reason, she was able to use a chemical treatment to break down ordinary cells and release DNA, which would not break open the sperm cells. She referred to the first process as the fraction one testing. For the second phase, she used a different chemical that broke open the DNA from sperm cells. She referred to that as fraction two testing.

St. Clair compared the DNA recovered from the sheets to Jackson's known reference. She determined that it was 920 octillion times more likely that Jackson was a donor for DNA found in fraction one of the fitted sheet than that the donors were both unknown. There was one donor for fraction two of the twin bed fitted sheet, and it was 1.4 nonillion times more likely that the sperm

-9-

originated with Jackson than an unknown donor. She got the same results for the pink, flat sheet except that, as for fraction two, it was 1.8 nonillion times more likely that Jackson contributed the sperm cells.

If the jury believed St. Clair, it could infer that it was statistically impossible for Jackson's DNA, which included DNA from his sperm cells, to have come from any person other than him. Accordingly, her testimony included sufficient statistical analysis to meet the foundational requirements of MRE 702. See *id*. at 4-11.

Notwithstanding that, Jackson argues that the prosecution failed to meet the requirements of MRE 702 because it did not present St. Clair with other reference samples and, for that reason, St. Clair was not able to identify whether the other donor whose DNA was found with Jackson's DNA on the sheets was Anderson. He maintains that the lack of information about the other donor rendered the testimony about Jackson's DNA speculative. Jackson's argument is meritless.

The fact that the other donor was unknown had no effect on the statistical analysis applicable to Jackson's DNA. St. Clair's testimony established beyond a reasonable doubt that Jackson's DNA, including from his sperm cells, were found on both sheets. The fact that there was other DNA on the sheets was not surprising and only implicated the inferences to be drawn from the evidence. Once the prosecution established the admissibility of the expert testimony consistent with the decisions in *Coy I* and *Coy II*, it was for the jury alone to determine what inferences to draw from that evidence. See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) (stating that, if evidence is relevant and admissible, it does not matter that the evidence gives rise to multiple inferences). It was also for the jury to determine whether the presence of Jackson's sperm cells and other DNA on the bed sheets corroborated AB's version of events or might have been the result of some inadvertent transfer or innocent event. Therefore, the trial court cannot be said to have committed a plain or obvious error by failing to sua sponte bar St. Clair's testimony on that basis. See *McFarlane*, 325 Mich App at 517-518.

Jackson contends that based upon same failure to provide other reference samples, the trial court should have excluded the DNA evidence under MRE 403. The fact that St. Clair did not know the identity of the other donor did not give rise to a danger that the jury would give undue or preemptive weight to the evidence that Jackson's DNA was found on the sheets. See *Crawford*, 458 Mich at 398. The jury was aware that Jackson, Anderson, and the four children occupied a small home under circumstances in which DNA might be deposited by any one of them throughout the home by direct or indirect transfers. Consequently, the presence of DNA from any one or more other family members on a sheet was not particularly helpful to a resolution of the factual dispute.

By contrast, the testimony that Jackson's sperm cells were found on the sheets was significant. Because of the unique characteristics of sperm cells, a reasonable jury could infer that the deposit of such cells was less common than the deposit of DNA from other sources, such as skin. It could further infer that the transfers to two different sheets within a relatively short time before the sheets were seized strongly suggested a direct transfer. From that, the jury could further infer that Jackson deposited his sperm cells during an incident of sexual assault. Considered as a whole, the evidence that DNA from Jackson's sperm cells was found on the sheets strongly corroborated AB's testimony. The admission of the DNA testimony was not unfairly prejudicial. MRE 403.

On this record, the trial court did not plainly err when it failed to exclude St. Clair's testimony under MRE 702, the decisions in *Coy I* and *Coy II*, or under MRE 403. Moreover, for the same reason, any objection on those bases would have been futile. Defense counsel does not provide ineffective assistance by failing to raise a meritless objection. *Clark*, 330 Mich App at 426.

## V. STANDARD 4 CLAIMS OF ERROR

### A. GENERAL CLAIMS OF ERROR

#### 1. THE PRELIMINARY EXAMINATION

Jackson also raises several claims of error in his brief submitted under Standard 4. Throughout his individual claims of error, Jackson argues that the district court and defense counsel committed errors at his preliminary examination that warrant a new preliminary examination.

Errors at the preliminary-examination stage are subject to harmless-error analysis and a defendant cannot show harm unless the error prejudiced his trial after being bound over. *People v Hall*, 435 Mich 599, 602-603; 460 NW2d 520 (1990). Our Supreme Court has explained the rationale for this rule: "To require automatic reversal of an otherwise valid conviction for an error which is harmless constitutes an inexcusable waste of judicial resources and contorts the preliminary examination screening process so as to protect the guilty rather than the innocent." *Id.* at 614. Our Supreme Court has since stated that when "a defendant has received a fair trial, appellate review is limited to the trial court's denial of a motion for a directed verdict." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006). As will be explained, Jackson had a fair trial; for that reason, any errors at the preliminary examination stage were harmless. See *People v Bennett*, 290 Mich App 465, 481; 802 NW2d 627 (2010) ("[T]he presentation of sufficient evidence to convict at trial renders any erroneous bindover decision harmless."). For this reason, we will not further address any claims of error involving the preliminary examination.[4]

#### 2. GENERIC DUE-PROCESS CLAIMS

Throughout his Standard 4 brief, Jackson also asserts that his right to due process was violated in various ways. In each case, however, Jackson identifies an alleged error at trial and discusses the law applicable to that particular claim of error. For many of these claims of error, Jackson then concludes—without further discussion—that the error amounted to a violation of due process.

The Supreme Court of the United States has stated that federal courts do not use habeas review to correct errors of state law—federal courts are only permitted to decide whether a conviction violated the Constitution. *Estelle v McGuire*, 502 US 62, 67; 112 S Ct 475; 116 L Ed

---

[4] Also, Jackson failed to provide this Court with the preliminary examination transcript, so any issues related to the preliminary examination are deemed abandoned. *People v Dukes*, 189 Mich App 262, 264; 471 NW2d 651 (1991).

-11-

2d 385 (1991). The Court explained that not every violation of state law amounts to a violation of due process. Rather, there are only a very narrow category of infractions that amount to a violation of due process. *Id*. at 72-73.

On appeal, Jackson has not addressed the federal authorities discussing when the application of state law can rise to the level of a due-process violation. He does not, for example, argue that this state's rules of evidence are arbitrary or did not serve a rational purpose. See *Nevada v Jackson*, 569 US 505, 509; 133 S Ct 1990; 186 L Ed 2d 62 (2013). He also does not argue that the application of any particular state law or rule violated a fundamental liberty protected by the Due Process Clause. See *Montana v Egelhoff*, 518 US 37, 41-51; 116 S Ct 2013; 135 L Ed 2d 361 (1996) (examining the historical application of a state rule to determine whether it had become a fundamental principle of justice protected by the Due Process Clause). Rather, for each claim of error, Jackson identifies either a state law or rule, which he claims was erroneously applied, or he frames his claim of error under well-established principles of federal law, such as the law applicable to claims involving prosecutorial misconduct and ineffective assistance of counsel. Therefore, to the extent that Jackson might be asserting a more general violation of due process as independent bases for relief, he abandoned those claims. See *Clark*, 330 Mich App at 426.

## B. HEARSAY

### 1. STANDARD OF REVIEW

In his first claim of error submitted under Standard 4, Jackson maintains that the trial court erred when it allowed hearsay testimony and defense counsel was ineffective for failing to object to the hearsay. This Court reviews a trial court's decision on an evidentiary matter for an abuse of discretion. See *McFarlane*, 325 Mich App at 517. This Court reviews de novo whether the trial court properly interpreted and applied the law. *Clark*, 330 Mich App at 415. Because Jackson did not preserve the evidentiary claim of error, this Court's review is for plain error that affected Jackson's substantial rights. *Id*. at 414. Whether defense counsel provided ineffective assistance at trial involves a mixed question of fact and law. *Gioglio*, 296 Mich App at 19. This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20.

### 2. ANALYSIS

Hearsay is a statement, "other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible unless an exception applies. See MRE 802.

Jackson asserts that the trial court should not have admitted statements that AB made to a witness because the statements were not admissible under MRE 803A, which involves an exception for hearsay statements by a declarant who was under 10 years of age. However, no statements were admitted under that rule.

-12-

Jackson also faults the trial court for allowing Anderson to offer the following testimony:

*Q.* When you took them to their Safe Harbor interview, what was their demeanor going to the interview that day?

*A.* I really don't recall. It wasn't anything super emotional or they weren't crying or nothing. I think they were just, you know, waiting to see what it was gonna be like or—

*Q.* Okay.

*A.* —you know, I talked to 'em a little bit and told 'em what it was, so.

It is unclear what about this testimony Jackson claims was objectionable. Anderson did not offer any hearsay testimony in this exchange and Jackson has not identified any other testimony that he claims amounted to objectionable hearsay.

To the extent that Jackson might be asserting that no witness should have been allowed to testify that AB told them anything about having been sexually abused, Jackson has not identified any statement that might fairly be described as having been offered to prove the truth of the matter asserted. See MRE 801(c). For example, Morrison testified that AB disclosed that Jackson had been sexually abusing her. During the relevant exchange, the prosecutor did not elicit any testimony about a specific statement that AB made, and Morrison did not provide any details. Instead, she simply agreed with the prosecutor's recitation of events and agreed that she called the police department after that sequence of events. The entire exchange showed that the prosecutor questioned Morrison in a way to avoid discussion of specific accusations and that the purpose of the questioning was to establish the effect that the disclosures had on Morrison. There was no indication that the prosecutor offered the testimony to prove the matter asserted. As such, it was not hearsay. See MRE 801(c).

Dr. Rekeny did testify about the statements that AB made to her. However, those statements were likely admissible as statements made for purposes of medical treatment or medical diagnosis. See MRE 803(4); *People v Shaw*, 315 Mich App 668, 674-675; 892 NW2d 15 (2016).

Jackson has not identified any hearsay statements that were made at trial that might have been objectionable. Accordingly, he has not shown that the trial court plainly erred. See *McFarlane*, 325 Mich App at 517-518. Additionally, in the absence of any record of an objectionable hearsay statement, Jackson cannot show that defense counsel's failure to object to the testimony on the ground that the statement amounted to inadmissible hearsay fell below an objective standard of reasonableness under prevailing professional norms. See *Gioglio*, 296 Mich App at 22.

## C. FALSE TESTIMONY AND IMPROPER CLOSING

### 1. STANDARD OF REVIEW

For his second claim of error, Jackson argues that the prosecutor deprived him of a fair trial. He argues that the prosecutor elicited false testimony, which she left uncorrected, and made improper remarks in her closing statement.

This Court reviews de novo whether a prosecutor's misconduct deprived the defendant of a fair and impartial trial. *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003). Because these claims of error are unpreserved, Jackson must show that there was an error, that the error was plain or obvious, and that the error affected the outcome of the trial. See *McFarlane*, 325 Mich App at 517-518.

This Court reviews de novo as a question of constitutional law whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Gioglio*, 296 Mich App at 19-20. Because the trial court did not hold an evidentiary hearing on this claim of error, there are no factual findings to which this Court must defer, and this Court's review is for mistakes that are apparent on the record alone. See *id*. at 20.

### 2. ANALYSIS

The prosecutor's role is to "seek justice and not merely convict." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). A prosecutor can jeopardize a defendant's right to a fair trial by interjecting issues broader than the defendant's guilt or innocence. *Id*. at 63-64. This Court examines claims of prosecutorial misconduct on a case-by-case basis and on the whole record to determine whether the conduct at issue was improper and deprived the defendant of a fair trial. *Id*.

Jackson argues that the prosecutor knowingly presented false testimony from the various witnesses. It is a violation of due process for a prosecutor to knowingly use false testimony to obtain a conviction. *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015). A prosecutor also has a duty to correct testimony that he or she knows to be false. *Id*. at 476.

In making his claim, Jackson identifies what he believes are inconsistencies between the witnesses' testimonies. He cites inconsistencies from the preliminary examination and inconsistencies between witnesses' versions of events. On the basis of those inconsistencies, Jackson maintains that the prosecutor must have knowingly elicited false testimony or failed to correct testimony that she knew was false.

Jackson has the burden to demonstrate that the testimonies at issue were actually false. See *People v Bass*, 317 Mich App 241, 274; 893 NW2d 140 (2016). Jackson's identification of inconsistencies from the preliminary examination and between witnesses' versions of events does not satisfy that burden. "Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false." *Id*. at 275; see also *Tapia v Tansy*, 926 F2d 1554, 1563 (CA 10, 1991) ("Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony."). The prosecutor also had

no obligation to correct minor mistakes or inaccuracies in witnesses' statements. See *Smith*, 498 Mich at 475-476. Finally, the prosecutor did not have to disbelieve her own witness simply because another witness's testimony contradicted her witness's testimony. See *People v Lester*, 232 Mich App 262, 278-279; 591 NW2d 267 (1998), overruled on other grounds *People v Chenault*, 495 Mich 142; 845 NW2d 731 (2014). Jackson has not identified any basis for concluding that the prosecutor elicited false testimony from any of her witnesses or that she let false testimony go uncorrected. Therefore, he has not shown that the use of false testimony deprived him of due process. See *Smith*, 498 Mich at 475-476.

Jackson asserts that defense counsel provided ineffective assistance for failing to challenge the false statements. Jackson has not shown that the prosecutor elicited false testimony, and defense counsel cannot be faulted for failing to object to the use of false testimony in the absence of evidence that the testimony was in fact false. See *Clark*, 330 Mich App at 426.

Jackson also claims that defense counsel should have sought to "quash" JB's testimony at the preliminary examination once JB stated "yes" when asked whether Ellis told her what words to use when speaking with Morrison. The prosecutor objected before defense counsel asked this question and before the trial court ruled on the objection. JB subsequently clarified that Ellis told her to tell the truth.[5]

Jackson also makes a vague reference to the DNA testing performed on the sheets and suggests that the prosecutor committed misconduct by failing to provide reference samples that would have allowed the lab to identify who the other donor of the DNA might have been. The prosecutor had no duty to seek and find exculpatory evidence or otherwise investigate on the defense's behalf. See *People v Burwick*, 450 Mich 281, 289 n 10; 537 NW2d 813 (1995). For that reason, it cannot be said that the failure to offer additional reference samples to the lab amounted to prosecutorial misconduct.

Jackson argues that the prosecutor also made statements about the facts that were contrary to the evidence and improperly vouched for AB. "A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66 (citations omitted). Moreover, the prosecutor has wide latitude in arguing the facts and reasonable inferences and does not have to confine her arguments to the blandest possible terms. *Id*.

The prosecutor argued in her closing that the "girls knew" about the explicit pictures on Jackson's phone involving their mother because Jackson showed them to the girls. She later related that both girls knew about the pictures and that AB knew about them because Jackson showed them to her.

JB did not testify that Jackson showed her explicit images. Nevertheless, there was testimony and evidence that suggested that both girls knew about the presence of explicit images

---

[5] The prosecutor's brief in response to Jackson's standard 4 brief, pages 12-13, contains the exchange.

of their mother on Jackson's phone. Anderson testified that there were pictures and videos of her and Jackson on Jackson's phone. She also admitted that she heard that JB and AB knew about the images, although she was not certain. Jackson also agreed that he had such pictures on his phone. Finally, AB testified that Jackson showed her the explicit images of her mother.

Accordingly, there was evidence to support the prosecutor's argument that the evidence showed that both AB and JB knew about the explicit images. There was also support for the prosecutor's claim that Jackson showed the images to AB. While there was no evidence that Jackson showed the images to JB, the trial court cured any minimal prejudice caused by this mischaracterization of the evidence when it instructed the jury that the parties' closing statements were not evidence and that the jury should only accept the lawyers' comments when supported by evidence at trial. See *Dobek*, 274 Mich App at 66 n 3. Consequently, even if it were plain error to remark that Jackson showed the images to JB, any error had no effect on the outcome of the case and does not warrant relief. See *McFarlane*, 325 Mich App at 517-518.

Jackson also complains that the prosecutor vouched for AB's credibility. A prosecutor may not vouch for the credibility of a witness by suggesting that he or she has some special knowledge that the witness is testifying truthfully. See *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). The prosecutor's remarks must be understood in context, *People v Ackerman*, 257 Mich App 434, 452; 669 NW2d 818 (2003), and prosecutor is free to argue from the facts that a witness is credible or not worthy of belief, *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008).

In her closing, the prosecutor opined that JB and AB were worthy of belief. She explained that the jury heard that both children used age-appropriate descriptions of what happened to them. They both discussed years of sexual abuse, and their statements at trial were consistent with what they told the physician who examined them. The prosecutor also discussed the expert testimony that put into context the children's failure to come forward earlier. She also noted that the children had no motive to fabricate their claims, and the evidence that Jackson's semen was found on sheets the children normally used supported their statements. At no point did the prosecutor argue or even imply that she had special knowledge that AB was telling the truth. See *Bahoda*, 448 Mich at 276. Rather, she argued from the facts that AB was worthy of belief and Jackson was not. There was nothing improper about that argument. See *Unger*, 278 Mich App at 240.

Jackson has not shown that the prosecutor elicited false testimony or failed to correct false testimony. Jackson also has not shown that the prosecutor improperly vouched for AB. Jackson also failed to show that the prosecutor's remarks about the evidence amounted to plain error that warrants a new trial. See *McFarlane*, 325 Mich App at 517-518.

## D. GREAT WEIGHT

### 1. STANDARD OF REVIEW

Jackson also argues that the trial court plainly erred when it allowed his verdict to stand despite that it was contrary to the great weight of the evidence. This Court reviews a trial court's decision whether to grant a new trial premised on the great weight of the evidence for an abuse of discretion. *People v Roper*, 286 Mich App 77, 84; 777 NW2d 483 (2009). Because he did not

preserve this claim of error for appellate review, this Court reviews the claim for plan error. *People v Cameron*, 291 Mich App 599, 616-617; 806 NW2d 371 (2011).

## 2. ANALYSIS

> In order to warrant a new trial on the ground that a verdict is against the great weight of the evidence, the evidence presented at trial must preponderate so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Conflicting testimony alone will not typically warrant reversal. Rather, where there is conflicting testimony, unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination. [*Roper*, 286 Mich App at 90 (quotation marks and citation omitted).]

On appeal, Jackson argues that the jury could not believe AB because the sexual conduct that she accused him of having committed would, he believes, have left some physical evidence on her body. For that reason, he concludes, the fact that her medical exam came back normal proved that AB was not telling the truth.

The Legislature defined "sexual penetration" to mean "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however, slight, of any part of a person's body" into the "genital or anal openings of another person's body." See MCL 750.520a(r); see also MCL 750.520b(1)(a) (criminalizing sexual penetration of a person under 13 years of age). An intrusion into the labia majora is sufficient to establish penetration, see *People v Lockett*, 295 Mich App 165, 188; 814 NW2d 295 (2012), as would be an intrusion between the buttocks, *People v Anderson*, 331 Mich App 552, 560; 953 NW2d 451 (2020). Accordingly, it was not necessary for the prosecution to prove that Jackson penetrated AB's vagina or anus to establish a first-degree criminal sexual conduct; moreover, the prosecution did not have to prove a physical injury as an element of either first or second-degree criminal sexual conduct as charged in this case. See MCL 750.520b(1)(a); MCL 750.520c(1).

AB's testimony was adequate to establish all the elements of first and second-degree criminal sexual conduct. See MCL 750.520b(1)(a); MCL 750.520c; *People v Hoskins*, 342 Mich App 194, 209 n 8; ___ NW2d ___ (2022) (stating that a victim's testimony is alone adequate to establish the elements of a criminal sexual conduct offense). AB testified about repeated incidents in which Jackson committed sexual penetration using his tongue, his fingers, and his penis. She described penetration of her labia and her buttocks. Although she indicated that she suffered pain on occasion, she denied that she ever bled. She also described incidents in which Jackson made sexual contact other than penetration.

Common sense suggests that the penetrations that AB described would not cause injury—even with repetition over years. Similarly, the sexual contact sufficient to establish second-degree

criminal sexual conduct would also—as a matter of common sense—leave no physical injury. See MCL 750.520a(q); MCL 750.520c. Dr. Rekeny testified consistently with these understandings.[6]

Therefore, contrary to Jackson's contention on appeal, the fact that AB's medical examination came back normal did not contradict indisputable physical facts or defy physical reality. See *Roper*, 286 Mich App at 90. To the contrary, the normal result was entirely expected. Because there was no basis for concluding that AB's testimony had been deprived of all probative value, it was for the jury alone to determine whether she was credible. See *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998). Consequently, the jury's verdict was not contrary to the great weight of the evidence. See *Roper*, 286 Mich App at 90.

Jackson has not shown that the trial court plainly erred when it allowed the verdict to stand. See *Cameron*, 291 Mich App at 617.

## E. ADDITIONAL WITNESSES

### 1. STANDARD OF REVIEW

In his fourth claim of error, Jackson complains that defense counsel provided ineffective assistance by failing to call expert witnesses and character witnesses. Whether defense counsel provided ineffective assistance at trial involves a mixed question of fact and law. *Gioglio*, 296 Mich App at 19. This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20. This claim is limited to errors that are apparent on the record. *Sabin*, 242 Mich App at 658.

### 2. ANALYSIS

To establish his ineffective assistance of counsel claim, Jackson must show that defense counsel's failure to call the witnesses fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for the failures, the outcome of his trial would have been different. See *Vaughn*, 491 Mich at 669. Jackson also had the burden to establish the factual predicate for his claims of error. See *Ackerman*, 257 Mich App at 455. To that end, Jackson had to present evidence that identified the witnesses whom he claims should have been called and had to show that they would have testified favorably to the defense. See *id*.

---

[6] Dr. Rekeny testified that she had performed over 500 sexual-abuse examinations. She stated that, in the majority of cases involving sexual abuse, the patient's examination would be normal. She explained that a child who has started her period has sufficient maturity that, even with vaginal penetration, there would be no injury. Even when there was a small injury, in the majority of cases, it would heal without leaving evidence. Evidence of injury to the buttocks was even rarer because it was meant to "dilate" to allow feces to come out, so only "very rarely" would there be evidence of injury. Dr. Rekeny also clarified that rubbing, licking, and touching would not normally cause injury.

Jackson states that he would have liked an expert to testify about child memory, suggestibility, and false memories, and he identifies his preferred expert. He has not, however, presented any evidence that this expert was ready, willing, and able to testify favorably to his defense. Jackson similarly has not identified any medical expert who would opine that AB would have had physical changes to her body given the sexual contacts that she described. Finally, Jackson has not identified a single character witness who was willing to testify on his behalf. In the absence of such proofs, Jackson cannot establish that there was a reasonably probability that, but for defense counsel's failure to call these witnesses, the result of the proceedings would have been different. See *id*.

## F. LEADING QUESTIONS

### 1. STANDARD OF REVIEW

Jackson next claims that the prosecutor deprived him of a fair trial through the use of leading questions and other improper questioning. This Court reviews de novo whether a prosecutor's misconduct deprived the defendant of a fair and impartial trial. *Abraham*, 256 Mich App at 272. Because these claims of error are unpreserved, Jackson must show that there was an error, that the error was plain or obvious, and that the error affected the outcome of the trial. See *McFarlane*, 325 Mich App at 517-518.

### 2. ANALYSIS

A leading question is a question that suggests the answer that the examiner expects. *People v Hodge*, 141 Mich 312, 314; 104 NW 599 (1905). A question is not, however, leading simply because the examiner includes information on subjects about which the examiner desires testimony. *Id*. Under normal circumstances, counsel may not use leading questions on direct examination. See MRE 611(d)(1). The trial court may permit the use of leading questions on direct examination when necessary to develop the witness's testimony. MRE 611(d)(1). Trial courts generally give prosecutors broad leeway to ask leading questions of a child witness. See *People v Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001). The improper use of leading questions does not warrant relief unless the defendant demonstrates that there was some prejudice or a pattern of eliciting inadmissible testimony. *Id*. at 587-588.

Jackson complains that the prosecutor engaged in improper leading questions when she asked AB about the sheets. The prosecutor explored that topic after first asking AB whether Jackson's semen ever got onto her sheets during one of the sexual encounters:

> *Q*. Would any of it ever get on the sheets?
>
> *A*. Yes.
>
> *Q*. Yes? And how do you know that?
>
> *A*. 'Cause some of it would, 1ike, fall, like, drool—drizzle down from his penis onto the sheet.
>
> *Q*. Okay. Would the sheets be wet or dry after this happened?

*A.* There would be spots that are wet.

*Q.* Okay. And what did your sheets look like? Do you remember?

*A.* No.

*Q.* No? What's your favorite color?

*A.* Purple.

*Q.* Purple? Okay. Would you have had purple sheets?

*A.* Yes.

*Q.* Or pink sheets or, I mean, what kind of colored sheets do you think you would've had?

*A.* Pink, purple, blue. I remember I had a Detroit Lion one.

*Q.* Okay. So, you had lots of different sheets?

*A.* Yes.

*Q.* Okay. And would some of these be sheets that had—would there be any specific characters on them? Like, cartoon characters or anything like that? Or don't you remember?

*A.* No, I don't remember, really.

The prosecutor at no point suggested the answer that she expected from AB. Instead, she simply provided background information about the topic that she wanted AB to address in her answer. Therefore, her questions were not leading. See *Hodge*, 141 Mich at 313-314.

Jackson also asserts that the prosecutor's questions were improper because the prosecutor should not have persisted with her questioning once AB stated that she did not recall what her sheets looked like. Jackson has not identified any law or rule that requires a prosecutor to accept the first answer that a witness provides without further examination or testing of that answer. In any event, it is well settled that prosecutors have wide latitude to examine "immature and diffident children necessarily called as witnesses," especially in cases when the "subject-matter upon which they were interrogated naturally tended to embarrass and, at times, confuse them." *People v Kratz*, 230 Mich 334, 340; 203 NW 114 (1925). The prosecutor's decision to further explore AB's memory of her sheets was not improper.

Jackson makes similar claims about the prosecutor's persistence when questioning JB about whether Jackson's semen ever got on her or her sheets. On direct examination, JB initially stated that Jackson's semen never got on her, and the prosecutor accepted her answer and began to question her about the location where the incidents would occur. After JB disclosed that it sometime occurred in her bedroom, the prosecutor asked her what her sheets looked like. JB

denied recalling what her sheets looked like. The prosecutor then asked her where she was on the bed when Jackson would masturbate over her and ejaculate. JB stated that sometimes she would be lying on the bed, and other times she would be sitting while Jackson stood in front of her. JB stated that she did not recall whether anything got on the bed when he did that. The prosecutor then asked whether Jackson ever cleaned up the semen. JB responded only "if it got on me," but she explained that it mostly would be on him.

The questions were not leading and nothing about the questioning amounted to badgering JB into giving an answer. The prosecutor carefully and respectfully questioned JB about issues that were germane to the charges at issue. The questions were entirely proper.

Jackson also faults the prosecutor for continuing to explore the circumstances involving Jackson's sexual assaults without simply accepting whatever description JB first gave. The prosecutor, for example, asked JB whether there was ever a time when Jackson would touch the back of her body after she stated that he touched her breasts and vagina. JB answered that he probably touched her butt. The prosecutor also elicited testimony from JB that the incidents only happened whenever Jackson was alone with them. The prosecutor examined what JB understood by that and to that end asked whether the incidents ever occurred when Anderson was home, but "sleeping or something else?" JB responded: "Yes, when she was sleeping or in the shower."

To the extent that the prosecutor asked whether it happened when Anderson was sleeping, that question was an isolated example of leading, which does not warrant relief. See *Watson*, 245 Mich App at 587-588.

Jackson maintains that the prosecutor also asked leading questions of Ellis. Specifically, he cites an incident when the prosecutor summarized her understanding of Ellis's previous testimony and inquired whether that was what he said. Notably, Ellis had earlier described the moment when he returned with JB to Morrison's home in a long narrative that included numerous details and in which he asserted that he stepped back to avoid being accused of coercing anyone. After that narrative answer, the prosecutor indicated that she wanted to clarify some things. She then asked questions about the persons involved in the conversation at Morrison's home and their specific locations. As part of that clarification, the prosecutor summarized a portion of his earlier testimony and asked if that summary was accurate: "Okay. And so, then, when you got to Grandma's house, did somebody—so, you had—you had [JB] talk to Grandma alone. Is that what you said?" The prosecutor's question did not suggest that Ellis had to agree with her summary, so it was not leading. See *Hodge*, 141 Mich at 313-314.

Jackson also faults the prosecutor for eliciting testimony that satisfied the elements of the charges at issue. It is the prosecutor's role to seek justice and not merely convict. See *People v Meissner*, 294 Mich App 438, 455; 812 NW2d 37 (2011). Nevertheless, the prosecutor had a duty to establish every element of the offenses charged and could do so by presenting the evidence of her choice. See *People v Mills*, 450 Mich 61, 69-71; 537 NW2d 909 (1995). It was not improper for the prosecutor to elicit testimony that established the elements of the charges at issue.

Finally, Jackson argues that the prosecutor deprived him of a fair trial by directly insulting him in her opening statement. A prosecutor may "not resort to civic duty arguments that appeal to the fears and prejudices of jury members or express their personal opinion of a defendant's guilt,

and must refrain from denigrating a defendant with intemperate and prejudicial remarks." *Bahoda*, 448 Mich at 283-284.

In her opening statement, the prosecutor described the evidence that she believed would be presented. She then noted that she could establish the elements of the charges at issue solely using AB's testimony: "And so, it is not necessary that there be evidence other than the testimony of [AB], as long as that proves beyond a reasonable doubt that this occurred. Okay?" The prosecutor then turned to the elements that she had to prove, but before relating those elements, the prosecutor told the jury that there were some things that they might want to know, but that she had no obligation to prove:

> I don't have to prove motive. I don't have to prove why something happened. I don't have to prove to you that Defendant's a bad guy. I don't have to put on evidence that he's a jerk.

> I just have to prove to you that this is what happened. He may be a nice guy. But I need to show to you beyond a reasonable doubt that the offense occurred. All right?

Examining the remarks in context, which this Court must do, see *Dobek*, 274 Mich App at 63, the remarks did not amount to a direct insult. To be sure the prosecutor did state that she did not have to present evidence that Jackson was a "jerk," but she also opined that he might be a "nice guy." Stated another way, she informed the jury that the issue before it was not whether he was a jerk or a nice guy, but rather the question was whether he committed the offenses at issue. The prosecutor was not required to couch her opening statement in bland terms, see *id.*, and her use of the term "jerk" was nothing more than a rhetorical device to bring home the fact that such considerations were not relevant to deciding the charges. The prosecutor's statement did not amount to improper denigration using intemperate and prejudicial remarks. See *Bahoda*, 448 Mich at 283-284.[7] Jackson has not demonstrated that the prosecutor's questions were improper or that she engaged in misconduct during her opening statement.

## G. SUFFICIENCY OF THE EVIDENCE

### 1. STANDARD OF REVIEW

In the sixth claim of error from his Standard 4 brief, Jackson argues that this Court must vacate his convictions because the prosecutor failed to present sufficient evidence to establish

---

[7] Even to the extent that it could be said that the prosecutor's remarks implied that she thought that he was in fact a jerk, her remark would not warrant relief. The trial court's instruction that the parties' statements were not evidence was more than adequate to cure whatever minimal prejudice occasioned by the use of that term. See *Abraham*, 256 Mich App at 279. In the same vein, had defense counsel objected to this remark, the trial court could have instructed the jury to disregard the reference, which would also have cured any prejudice. See *id*. Therefore, this isolated comment does not warrant reversing Jackson's convictions.

them. This Court reviews a challenge to the sufficiency of the evidence by examining the evidence presented at trial de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the prosecution proved the essential elements of the offenses beyond a reasonable doubt. See *Clark*, 330 Mich App at 436.

## 2. ANALYSIS

On appeal, Jackson does not contest the sufficiency of the evidence that he committed second-degree criminal sexual conduct. Instead, he asserts that there was no evidence to support that he committed first-degree criminal sexual conduct. More specifically, he asserts that AB incorrectly described his genitals and complains that there was no physical evidence, no eye witnesses, no evidence of a rape kit, and no medical testimony establishing that these things occurred. In that context, he asserts that the prosecutor had to prove that he injured AB and used force or coercion to effect penetration. Jackson's assessment does not accurately reflect the law.

The prosecutor charged Jackson with three counts of first-degree criminal sexual conduct under MCL 750.520b(1)(a), which provides that a "person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and" that person is "under 13 years of age." See also *People v Hack*, 219 Mich App 299, 303; 556 NW2d 187 (1996). When the victim is under 13 years of age, the prosecutor has no obligation to prove that the actor caused personal injury and used force or coercion. Cf. MCL 750.520b(1)(f). The evidence showed beyond a doubt that AB was under the age of 13 during the time of the events at issue. As such, the sole question was whether Jackson engaged in sexual penetration with her.

The Legislature defined "sexual penetration" to mean, in relevant part, "cunnilingus . . . or any other intrusion, however, slight, of any part of a person's body" into the "genital or anal openings of another person's body." See MCL 750.520a(r). As already discussed, an intrusion into the labia majora or between the buttocks would be sufficient to establish penetration. See *Anderson*, 331 Mich App at 560; *Lockett*, 295 Mich App at 188.

AB testified that Jackson repeatedly and regularly subjected her to sexual misconduct over a span of years. She described instances of cunnilingus and stated that he touched and rubbed her vagina, her breasts, and her butt. He rubbed his hand up and down and in circles. Sometimes she felt his hand inside her. She also explicitly stated that Jackson put his tongue in her "vagina hole" and put his penis in her butt twice. AB's testimony was more than sufficient to establish that Jackson engaged in sexual penetration with AB on at least three occasions, and the prosecutor had no obligation to corroborate her testimony. See *Hoskins*, 342 Mich App at 209 n 8.

The prosecution presented sufficient evidence to support Jackson's convictions.

## H. SUPPRESSION OF EVIDENCE

### 1. PRESERVATION AND STANDARD OF REVIEW

For his last claim of error, Jackson argues that the prosecution deprived him of a fair trial by suppressing or failing to preserve evidence. To preserve a claim that the prosecutor improperly suppressed evidence, the defendant must move for a new trial or relief from judgment in the trial court on that basis. *People v Abcumby-Blair*, 335 Mich App 210, 217; 966 NW2d 437 (2020).

Jackson did not move for a new trial or for relief from judgment in the trial court. Therefore, this claim of error is not preserved. See *id*.

This Court reviews de novo questions of constitutional law. *Clark*, 330 Mich App at 415. Because this claim of error is unpreserved, this Court's review is limited to determining whether there was plain, outcome-determinative error. See *Abcumby-Blair*, 335 Mich App at 217.

2. ANALYSIS

The prosecution had a duty to turn over evidence that it had within its control. *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To establish a violation that warrants relief, Jackson must demonstrate that the prosecution suppressed evidence, which was favorable to him, and which was material. See *Abcumby-Blair*, 335 Mich App at 217. If the defense knew about favorable evidence, that knowledge will reduce the likelihood that the defendant can establish his or her claim that the prosecutor suppressed evidence. See *Chenault*, 495 Mich at 155.

Jackson first suggests that the prosecutor suppressed evidence when she improperly stopped Dr. Rekeny from testifying so as to "conceal the [medical] results from the fact finders." There is no indication in the record that the defense did not have access to Dr. Rekeny's medical reports. In fact, the record suggests the opposite. On cross-examination, defense counsel asked Dr. Rekeny whether the results of her medical examinations were inconclusive. More specifically, he asked Dr. Rekeny whether it was true that she could neither rule in, nor rule out, whether a sexual assault happened. Dr. Rekeny responded with her own question: "Are you asking me to give my medical diagnosis?" At that point, the prosecutor objected because she felt that the question was inviting an answer that would be inconsistent with that allowed under the law. Defense counsel then referred to Dr. Rekeny's report, and the trial court held a bench conference. After the bench conference, defense counsel confirmed that Dr. Rekeny's examinations of both children were normal.

It is obvious from the context of the proceedings that the prosecutor intervened to protect the defendant's right to a fair trial. If Dr. Rekeny would have testified that she would have diagnosed the children with having been the victims of pediatric sexual assault, such testimony would have been improper. See *People v Thorpe*, 504 Mich 230, 254-255; 934 NW2d 693 (2019) (stating that a doctor cannot give an opinion that the complainant was sexually assaulted if the opinion amounts to nothing more than the doctor's opinion that the complainant is telling the truth). The prosecutor's intervention was not only proper, it was laudable.

Jackson next argues that the prosecutor in effect suppressed evidence because the state trooper who responded to the initial report did not act faster to secure a medical examination for both children. The state has a duty to preserve material evidence that might exonerate the defendant. See *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012). To establish a violation of due process premised on the failure to preserve evidence, Jackson must show that the state acted in bad faith when it failed to preserve the evidence and that the evidence was potentially exculpatory. See *id*.

There is no evidence that any state actor acted in bad faith when handling the children's referral for medical examination. There is also no indication that, but for the delay, the medical examination would have revealed any additional evidence, let alone evidence that would exculpate Jackson. Accordingly, Jackson has not shown that the prosecution failed to preserve evidence or otherwise suppressed evidence involving the medical examination. See *Abcumby-Blair*, 335 Mich App at 217; *Heft*, 299 Mich App at 79.

Finally, Jackson indicates that the prosecutor suppressed the Children's Protective Services (CPS) report, which revealed information that he could have used to impeach Anderson and Ellis. Specifically, he notes the report showed that Anderson's trial testimony about the incident where the children viewed pornography was inconsistent with her statements to investigators with CPS and that Ellis admitted that he had a past criminal record.

There is no record evidence that the prosecutor failed to turn over the CPS report or that defense counsel was unaware of the information in it. To the contrary, defense counsel's examination of Anderson about the pornography incident suggests that he was aware of the facts surrounding that incident.

In any event, even if the prosecutor could be said to have violated her duty to turn over this report, Jackson has not shown that the evidence was material. See *Abcumby-Blair*, 335 Mich App at 218. To establish materiality, Jackson had to show that there was a reasonably probability that the result of the proceeding would have been different, but for the suppression of the evidence. A reasonable probability is a probability sufficient to undermine confidence in the outcome. See *id*.

At trial, Anderson testified that both AB and JB had been caught watching pornography, but she denied that she was the one who caught them. Jackson states that Anderson told a CPS worker that she was the one who caught the children. The key fact was whether the children had been exposed to pornography from a source other than Jackson; whether Anderson was the one who caught the children was not particularly relevant or important. As such, there is no possibility that the outcome would have been different had defense counsel impeached Anderson with her statement to the CPS investigator.

The same is true for the claim that defense counsel could have impeached Ellis with his admission that he had a conviction of criminal sexual conduct from 25 years earlier. It is not clear that defense counsel could have used the conviction to impeach Ellis. See MRE 609(c). Moreover, even if he had been able to impeach Ellis with the prior conviction, Jackson cannot show that, but for the suppression of the evidence, there was a reasonable probability that the outcome would have been different. See *Abcumby-Blair*, 335 Mich App at 218.

Jackson has not established any plain errors involving the suppression or failure to preserve evidence.

## VI. CONCLUSION

Jackson has not demonstrated that there were any errors at his trial that warrant relief.

Affirmed.

/s/ Brock A. Swartzle
/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney